UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

BONNIE BRYSON and CLAIRE SHEPARDSON,
on behalf of themselves and
all others similarly situated,
        Plaintiffs                    Civil No. 99-cv-558-SM
        v.                                CLASS ACTION
                                     Opinion No. 2006 DNH 113
JOHN STEPHEN, in his capacity as
Commissioner of the State of
New Hampshire Department of
Health and Human Services; and
MATTHEW ERTAS, in his capacity as
Director of the State of
New Hampshire Bureau of
Developmental Services,
        Defendants

**O R D E R**

As noted by Judge Kozinski, exploring the relationship between Medicaid and the integration mandates of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") requires navigating in murky waters. ARC of Washington State, Inc. v. Braddock, 427 F.3d 615, 617 (9th Cir. 2005). Here, the plaintiff class, consisting of persons who have acquired brain disorders ("ABDs") and who qualify for home and community-based care services ("HCBC") under New Hampshire's Medicaid ABD waiver program[1], contend that the State's

---

[1]    The plaintiff class, as certified, consists of individuals with acquired brain disorders who are currently institutionalized in nursing homes, psychiatric hospitals,

administration of that program operates to discriminate against
them based upon disability.  Specifically, plaintiffs complain
that the State is depriving them of rights to community
integration mandated by Title II of the Americans with
Disabilities Act, 42 U.S.C. § 12132, and its implementing
regulations, as well as Section 504 of the Rehabilitation Act of
1973, 29 U.S.C. § 794, and its implementing regulations.  They
seek declaratory and injunctive relief under 42 U.S.C. § 1983,
requiring the State to modify its Medicaid program to accommodate
their participation in the ABD waiver program, by increasing the
cap on the number of persons admitted to the program to the point
that the waiting list is eliminated.

Most of the issues originally presented in this case have
been resolved earlier by this court, by the court of appeals, see
Bryson v. Shumway, 308 F.3d 79 (1st Cir. 2002), or by agreement
of the parties.  The remaining issues — those raised in Counts 3
and 4 of the complaint as described above — were tried to the
court.  Simultaneously with this order, the court has ruled on
the parties' numerous requests for findings of fact and rulings

---

general hospitals, rehabilitation facilities, or other settings,
who are able to be discharged into a less restrictive community
setting, or they are individuals who are in the community but
who, in the absence of home and community-based services, are
likely to be placed in a nursing home, psychiatric facility,
rehabilitation facility or other institution.

of law, but, generally, the pertinent facts are largely
undisputed.  The basic point of contention is whether plaintiffs
are entitled to declaratory and injunctive relief forcing the
State to obtain enough additional ABD waiver program slots to
afford all members of the class prompt placement into that
program.  Under the circumstances presented in this case, they
are not.

## Discussion

New Hampshire, like every other state, participates in the
federal Medicaid program, "an optional plan under which the
federal government, through the states, partially funds medical
assistance to needy individuals."  <u>Bryson</u>, 308 F.3d at 81-2
(citations omitted).  "Medicaid is a payment scheme, not a scheme
for state-provided medical assistance, as through state-owned
hospitals," and involves the provision of "<u>financial</u> assistance
rather than . . . actual medical <u>services</u>."  <u>Bruggeman v.
Blagojevich</u>, 324 F.3d 906, 910 (7th Cir. 2003).

Under the Medicaid program, states may apply for certain
waivers.  If approved, such waivers permit the states to operate
model programs in which home and community-based care services,
not otherwise authorized, may be provided free of some of the

usual requirements (like statewide availability of services, and availability of such services to all persons equally).

The Medicaid waiver programs are "designed to allow states to experiment with methods of care, or to provide care on a targeted basis, without adhering to the strict mandates of the Medicaid system." Bryson, 324 F.3d at 82.  Those programs, as the court of appeals previously noted, are in theory expenditure-neutral.  That is to say, "the average estimated per capita expenditure under the waiver plans must not be more than the average estimated expenditure absent the waiver program."  Id. (citation omitted).  But, "[i]n practice, the waiver programs may be costly to the states, because even though the individuals served by the waiver plan are no longer being served by nursing homes or other [institutional] care facilities, other patients may take those nursing home spots."  Id. at 82-83.  And, "[m]any patients not currently being served under Medicaid may also apply for the waiver program."  Id. at 82 (citation omitted).  "The states thus have a financial incentive to keep their waiver programs small, or at least, to begin with small programs and grow them incrementally."  Id.

In 1993, New Hampshire applied for, and obtained, federal approval of an ABD waiver program, authorizing it to provide home

4

and community-based services to persons with acquired brain
disorders.  The ABD waiver program offers a community-based
alternative to institutional care for persons with ABDs.  That
program has been renewed periodically and continues through the
present time.  Since its inception, New Hampshire's ABD waiver
program has grown steadily.  Initially, the State funded 15
places in the ABD waiver program and now funds 132 places.
Demand for home and community-based ABD services, however, has
always exceeded the number of available places in the waiver
program.  But as the number of program places has steadily
expanded, the number of persons on the waiting list has remained
fairly constant.  In the first year, 25 people were on the
waiting list and, recently, in 2005, approximately 24 people were
awaiting placement in the program.

     The State does not intentionally leave waiver program slots
unfilled.  Rather, as existing slots become open, and new slots
are added, people on the waiting list are "earmarked" for those
slots, following which placement planning commences.  There is,
of course, some delay between a spot becoming available and it
being filled by someone on the waiting list.  But, those delays
generally are due to ordinary and necessary administrative
requirements, like planning, obtaining, and organizing services
and service-providers for the person moving off the waiting list

and into a community placement.  New Hampshire's ABD waiver program operates at full capacity in all practical respects – all slots are filled as they become available.

In the remaining counts in dispute, plaintiff class members argue that defendants are violating the integration mandates of the ADA and RA by artificially limiting the number of people who can participate in the program, thereby frustrating their rights not to be unjustifiably isolated in institutional care settings, and denying them the home and community-based medical care for which they are otherwise eligible and which they are willing to accept.  They assert that requiring them to remain in institutional settings, or face the prospect of placement in an institutional setting, until a slot in the waiver program becomes available, constitutes unwarranted discrimination based upon disability.

The Medicaid waiver program contemplates state waiver plans with definite limits on the number of persons to be served, and states "certainly have the right to include a limit on the number of waiver slots they request."  <u>Bryson</u>, 324 F.3d at 86.  And, New Hampshire's Department of Health and Human Services ("DHHS") sets its ABD waiver program limit, or cap, according to the amount of matching funds the legislature appropriates to support the

program.  Importantly, however, the ADA provides that "no
qualified individual with a disability shall, by reasons of such
disability, be excluded from participation in or be denied the
benefits of services, programs, or activities of a public entity,
or be subjected to discrimination by any such entity."  42 U.S.C.
§ 12132.  And, implementing regulations require that "[a] public
entity shall administer services, programs, and activities in the
most integrated setting appropriate to the needs of qualified
individuals with disabilities."  28 C.F.R. § 35.130(d).  The
Rehabilitation Act contains a similar provision, requiring states
to "administer services, programs and activities in the most
integrated setting appropriate to the needs of qualified
individuals with disabilities."  Pa. Prot. & Advocacy, Inc. v.
Pa. Dep't of Pub. Welfare, 402 F.3d 374 (3d Cir. 2005) (quoting
28 C.F.R. § 35.130(d) and citing 28 C.F.R. § 41.51(d)).


    Those statutory and regulatory requirements are generally
known as the "integration mandate."  That is, under those
statutes, states are required to provide services in integrated
environments for as many disabled persons as is reasonably
feasible, consistent with their medical needs.  See Olmstead v.
L.C. ex rel. Zimring, 527 U.S. 581, 592, 600–01 (1999).  "In
order to comply with the integration mandate, states are required
to make 'reasonable modifications in policies, practices, or

7

procedures' that are 'necessary to avoid discrimination on the basis of disability.'"  ARC of Washington State Inc., 427 F.3d at 618 (citing 28 C.F.R. § 35.130(b)(7)).

The obligation to make reasonable modifications in policies, practices, and procedures as necessary to provide integrated services does not, however, include an obligation to make "modifications [that] would fundamentally alter the nature of the service, program, or activity."  Id.  Because the Supreme Court has instructed courts to give states "leeway" in administering services for the disabled, courts will normally not tinker with comprehensive and effective state service delivery programs.  Id. (citing Olmstead and Sanchez v. Johnson, 416 F.3d 1051, 1067–68 (9th Cir. 2005)).

The principal issue here, then, is quite similar to that raised in ARC of Washington State, i.e., whether New Hampshire must seek additional ABD waiver program slots in order to meet its obligations under the integration mandates as established by the ADA and the RA, and as explained in Olmstead.  Plaintiffs' contention is straight-forward.  They say the ABD waiver program is too small, and the State can easily enlarge it by allocating additional funds to support it.  But whether New Hampshire must seek a cap increase and expand the waiver program "depends on

whether this would be a 'reasonable modification' (which is required) or a 'fundamental alteration' (which is not)." <u>ARC of Washington</u>, 427 F.3d at 619.

The ABD waiver program is an existing State program.  That program does facilitate integration into the community of people who otherwise would be treated in nursing homes or other institutions (or, who face the prospect of placement in such facilities) — people for whom institutional care would be isolating and unjustified.  Generally, the unjustified isolation of disabled persons in institutions is properly characterized as a violation of the ADA and RA.  <u>See</u> <u>Olmstead</u>, 527 U.S. at 600. Accordingly, New Hampshire is generally obligated under the ADA and RA to make reasonable modifications to its program as necessary to provide community-based treatment to qualified persons with disabilities, to the extent feasible and equitable, given available resources and the "responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities."  <u>Olmstead</u> 527 U.S. at 604.  But, as the Supreme Court has held, "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless." <u>Olmstead</u>, 527 U.S. at 603.

While recognizing that unjustified isolation of disabled persons in institutions does violate the ADA (and RA), still, the Supreme Court also recognized that there are some state justifications that will serve to defeat integration mandate challenges to its programs.  See ARC of Washington, 427 F.3d at 619.  So, for example, a state's need to maintain a range of facilities for the care and treatment of persons with diverse disabilities, and to administer services across a broad spectrum of need with an even hand, equitably apportioning limited resources, may suffice.  Id.; Olmstead 527 U.S. at 604.  Where community integration is accomplished through a Medicaid waiver program, a state could avoid having to modify its waiver program if it "were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated." Olmstead, 527 U.S. at 605–606.

In two cases very similar to this one, the Court of Appeals for the Ninth Circuit had occasion to determine whether a state must seek an increase in a Medicaid waiver program cap in order to meet its integration mandate obligations.  In both, the court held that requiring such a change would amount to a fundamental

10

alteration of the state's programs, and so rejected the plaintiffs' challenge.  <u>ARC of Washington State, Inc.</u>, <u>supra</u>; <u>Sanchez v. Johnson</u>, <u>supra</u>.


In <u>Sanchez</u>, the appeals court examined the record and found that the state had, over time, regularly applied for an increase in the size of the Medicaid waiver program; state expenditures for integrated community-based treatment had consistently increased over the prior decade; and the state's institutionalized population had decreased by over 20% during the prior four years.  The court concluded that the state was genuinely and effectively engaged in the process of deinstitutionalizing disabled persons "with an even hand," <u>Olmstead</u>, 527 U.S. at 605-06, and that its program was successfully integrating disabled persons into the community. Although a waiting list was maintained, the state did not allow waiver program slots to go unused and, once a program slot became open, that slot was available to every otherwise qualified disabled person awaiting placement.  Under those circumstances, the court concluded, the existence of a cap on the slots available in the waiver program did not violate the integration mandate, and the state was not required to seek an increase in the number of program slots.

In <u>ARC</u>, similar considerations dictated an identical result. Plaintiffs in <u>ARC</u> challenged the size, and, therefore, the adequacy of a Medicaid waiver program in light of the integration mandates.  The appeals court again focused on whether the waiver program served as an acceptable plan for deinstitutionalization, the disruption of which would involve a fundamental alteration of the program.  Noting in <u>ARC</u> that Washington's commitment to deinstitutionalization was as genuine, comprehensive, and reasonable as California's in <u>Sanchez</u>, the court observed that Washington's waiver program was substantial in size; all waiver slots were filled; all Medicaid-eligible disabled persons were afforded the opportunity to participate in the waiver program once a space became available, based solely on their individual needs and position on the waiting list; and when a slot became available, new participants were admitted from the waiting list. The court also noted that the waiver program increased dramatically in size over approximately fifteen years, from 1,227 to 9,957 slots, and the annual state budget for the program roughly doubled between 1994 and 2001, despite significant cutbacks or minimal budget growth for many other state agencies during the same period.

Although more can always be done, the reality is that states must make difficult decisions when allocating necessarily limited

12

resources.  Neither the ADA nor the RA require states to raise,

appropriate, and spend whatever amount is necessary to

immediately afford all qualified disabled persons community-based

services, without regard to other needs and spending priorities.

Here, defendants have proven that they maintain a comprehensive

and effective working plan for placing qualified persons with

ABDs in less restrictive settings through the ABD waiver program.

They have also shown that requiring the State to increase the cap

on program participants would involve a fundamental alteration of

that program.


New Hampshire's commitment to deinstitutionalization is as

genuine as California's in Sanchez and Washington's in ARC.


> Where there is evidence that a State has in place
> a comprehensive deinstitutionalization scheme, which,
> in light of existing budgetary constraints and the
> competing demands of other services that the State
> provides, including the maintenance of institutional
> care facilities, see Olmstead, 527 U.S. at 597, 119
> S. Ct. 2176, is "effectively working," id. at 605, 119
> S. Ct. 2176, the courts will not tinker with that
> scheme.  Olmstead does not require the immediate,
> state-wide deinstitutionalization of all eligible
> developmentally disabled persons, nor that a State's
> plan be always and in all cases successful.  Id. at
> 606, 119 S. Ct. 2176 ("It is reasonable for the State
> to ask someone to wait until a community placement is
> available.") . . . .


The ARC, 427 F.3d at 621 (quoting Sanchez, 416 F.3d at 1067-68).

13

New Hampshire's plan to provide community-based services to plaintiffs takes advantage of the Medicaid waiver program's flexibility to move institutionalized Medicaid-eligible persons with ABDs into community settings.  New Hampshire's ABD waiver program has also been expanded significantly and regularly since its inception, at the State's request.  In 1993, the program began with 15 available slots in the first year, 26 in the second, and 37 in the third, with each increase representing a proportional increase in state-allocated funding.  The waiver program has been renewed twice since 1996, each time for a 5 year period.  Currently the program has 132 available slots, all of which are either being used or are actively in the process of being filled.  The State does not intentionally maintain empty slots in the ABD waiver program, and consistently expends all funds budgeted for the program.

Additionally, the State's budgeting for the waiver program has also dramatically increased since the program began.  Since 2001, the State has increased the budgeted allocations for the ABD waiver program from $6.6 million to approximately $11.2 million, and the Department of Health and Human Services is

14

committed to seeking another substantial increase in the next
biennial budget, to over $13 million.[2]

The ABD waiver program has always had a waiting list.  It
seemingly holds steady at about 20-24 persons (as of December 15,
2005, the list included 17 persons).  On average, about four
program slots become available each year through natural
vacancies, and additional slots have been regularly added through
funding increases.  The vast majority of Medicaid-eligible
disabled persons with ABDs who want community-based care are
participating in the program – as noted, about 20 persons are on
the waiting list while more than 130 are participating in the
waiver program.  The list moves at a reasonable pace given that
the number of persons on the list has remained fairly stable

---

[2]     The funding history of the ABD waiver program does
disclose a budget reduction when, at the legislature's direction,
amounts previously appropriated for developmental disabilities
programs, among others, were "rescinded."  Defendants refer to
these recisions as "back of the budget reductions."  Such
reductions are particularly difficult for agencies because
appropriations are typically spent in a proportional fashion over
the two year biennium.  A reduction of already appropriated
amounts in mid-biennium means that the entire reduction amount
must be taken out of what remains of the already spent-down
original appropriation.  Such a reduction was directed in the
State's 2004 fiscal year, with $650,000 of state funds ($1.3
million taking into account the federal match) coming from the
ABD waiver budget.  But, because the State staggered service
dates and delayed implementation of the recision (the State and
federal fiscal years are not identical), no ABD waiver
participants were adversely affected.

while new slots have been added and vacant ones filled — though
plaintiffs do plausibly suggest that that situation may become a
problem in the future should program funding become static, or
shrink in amount.

　　While there are exceptions due to circumstances peculiar to
the individual needs of persons on the list, by and large the
wait for an open slot in the program is about a year — shorter
for some, longer for others.  As to the class as a whole, the
wait is reasonable.  The parties quarrel somewhat about the
appropriate time computation of a typical stay on the waiting
list, but a fair measure is the time between when a potential
participant applies and is determined to be eligible for the
program and when the State "earmarks" appropriated and available
funds associated with, or designates an available slot for him or
her.  After the slot is "earmarked," participant-specific
planning and resource acquisition unique to that individual
client necessarily requires some effort and time.  An average
wait of approximately twelve months on the list, from
qualification to assignment of a program slot, is not an
unreasonable period.

　　Because people on the waiting list have different degrees of
disability and different needs, some are more easily placed in

16

community settings than others (specifically tailored and
appropriate services must not only be identified, but providers
capable of delivering those specialized services must be found
and retained as well).  Accordingly, the State has developed a
waiting list priority system which reasonably, as to the class,
seeks to equitably allocate places in the ABD waiver program
based not only upon time waiting for a slot, but also upon
critical need.  The priority system is not based on degree of
disability.  That system also appears reasonable as presented.
It is, however, only reasonable to the extent it does not operate
to condemn some people to exorbitant delays in placement or,
worse, condemn them to perpetual waiting list status.  The State
also appears to be committed to promptly placing those who have
waited the longest due to planning, resource acquisition, or
other difficulties unique to those individual plaintiffs.
Certainly, however, if those individual circumstances are not
reasonably addressed in a timely manner relative to others on the
waiting list, those disadvantaged individuals may, of course,
bring legal claims on their own behalf.  (It should be noted, as
well, that not all persons on the waiting list are currently
isolated in institutional facilities.)

     With regard to cost allocations, it is apparent that as
people are moved from institutional care to the ABD waiver

program, vacated institutional beds are filled relatively
promptly.  Overall, then, the State does not experience
significant net cost savings as a result of moving persons into
the waiver program.  In fact, as noted by the court of appeals
for this circuit, movement of an institutional client to the ABD
waiver generally results in a net increase in overall costs —
because institutional care programs are also in demand and places
made available when someone moves to the ABD waiver are generally
filled within the same fiscal year as they become available.
Accordingly, absent additional funding by the legislature, the
State cannot easily allocate substantial additional funds to the
ABD program without also imposing disadvantages on other
developmentally disabled persons dependent upon the State for
similar services.  An immediate shift of resources from other
program line items in the Bureau of Developmental Disabilities'
budget to the ABD waiver program would, then, be inequitable in
that such action would necessarily adversely affect services for
other disabled persons.  See Williams v. Wasserman, 164 F. Supp.
2d 591, 638 (D. Md. 2001).  Nevertheless, the Department has
shown that it has some ability, as well as the commitment, to
obtain supplemental funding for the ABD waiver budget as
necessary to keep the waiting list moving at a reasonable pace.
Plainly, that continuing obligation will remain a legitimate
subject for scrutiny.

18

Plaintiffs argue, in part, that the reasonableness of the
modification to the ABD waiver they seek is illustrated by the
fact that the State has readily available resources that are more
than sufficient to cover the State's share of costs necessary to
expand the waiver to cover all class members.  They point to
general DHHS budget "lapses" as representing resources available
to the ABD program.

The implication that "lapsed" funds from the overall DHHS
budget represent freely available surplus money certainly
overstates the matter.  The State has many priorities, and
deficits in one arena necessarily call for savings in others.
The record is not sufficiently developed to permit the court to
determine that lapsed DHHS funds flowing back to the State's
general fund qualify as resources available to the ABD waiver
program, and on that point plaintiffs failed to meet their burden
of proof.

The "available resources" test properly focuses on the
State's mental health budget, not the overall DHHS budget or the
State's general budget.  See Olmstead, 527 U.S. at 597.  Here,
that budget admits of no easily redirected funds — at least not
without imposing disadvantages upon other equally deserving
persons with disabilities.  The State's budget for services to

19

those with mental disabilities is strained, and DHHS is, by and
large, doing what it can with the limited resources that have
been provided by the legislature.  As defendants point out,
amounts budgeted to serve those with developmental disabilities
are uniformly spent fully and for that purpose.

New Hampshire's ABD waiver program is, comparatively,
substantial in size, in that it accommodates the vast majority of
qualified disabled persons with ABD's seeking community-based
care services.  While the program does not serve all who wish to
participate, the cap on the number of participants has regularly
and steadily been increased.  All available program slots are
used; the program is available to all eligible persons as slots
become open, or are added due to increased funding; and, the
budget growth for the program has been significant, and has been
at least in line with or exceeding budget growth for other state
programs.  That budget growth demonstrates a commitment by the
State to continued progress in making the program available to as
many as qualify for and desire to participate in it as is
feasible given its other obligations and resources.  And, the
pace of movement on the waiting list is not controlled by the
State's endeavors to keep its institutions fully populated.  With
the occasional exception of a client residing in New Hampshire
Hospital, New Hampshire does not maintain public institutions for

the care of persons with ABDs, and, to the extent it provides
Medicaid reimbursement for costs associated with institutional
care for such persons, those expenditures would more than likely
continue even if a client were moved to the waiver program, as
there are waiting lists for those institutional services as well
and vacated spaces are promptly filled, usually within the same
fiscal year.

New Hampshire's program, as currently operated, constitutes
a "comprehensive, effectively working plan for placing qualified
persons with mental disabilities in less restrictive settings,
and a waiting list that move[s] at a reasonable pace not
controlled by the State's endeavors to keep its institutions
fully populated," Olmstead, 527 U.S. at 605-06.  Moreover, the
State has shown that its commitment to deinstitutionalization is
"genuine, comprehensive, and reasonable." Sanchez, 416 F.3d at
1067; ARC, 427 F.3d at 621.  As in ARC, this court does not hold
that forced expansion of a state's Medicaid waiver program can
never be a reasonable modification required by the ADA or RA, but
only that in this case, given the evidence presented, defendants
have met their burden of proving that forcing such an expansion
would fundamentally alter the existing program, which is, of
course, a model program designed to allow states to experiment
with targeted care, without meeting the strict mandates of the

21

Medicaid system.  To require an immediate expansion of the
limited program, and a concomitant appropriation of the necessary
state funds, sufficient to promptly include all class members in
the ABD program, would fundamentally alter the nature of the
program.

## Conclusion

At the risk of repetition, but for clarity's sake, the court
finds as follows:

1.    The State's ABD waiver program is sizeable, given the
      number of people participating in the program relative
      to the number of people currently on the waiting list
      seeking to participate.

2.    The ABD waiver program is full, the State fills vacant
      slots in a reasonably prompt amount of time, and the
      waiting list moves at a reasonable pace.

3.    The State's waiver program is available to all
      qualified Medicaid-eligible disabled persons as slots
      become available, based only on their medical and
      critical care needs, and not on any discriminatory
      criteria (such as, for example, monetary need).

4.    The State has consistently applied for increases in the
      size of the ABD waiver program – although it began by
      serving only fifteen individuals in 1993, it currently
      serves more than 130.

5.    The State's appropriations and expenditures for
      integrated community-based treatment under the ABD
      waiver program have substantially increased over time.

6.    The State's commitment to the deinstitutionalization of
      those for whom community integration is desirable is
      genuine, comprehensive, and reasonable, though
      obviously not complete.

Given the circumstances as they currently exist, as proven at trial, granting plaintiffs the relief they seek — immediate required expansion of the ABD waiver program to promptly include all plaintiffs — would constitute a fundamental alteration of the State's program, which is not required by the ADA or Section 504 of the Rehabilitation Act.

The court has entered contemporaneous rulings on the parties' requests for findings of fact and rulings of law.  The parties may, but are not required to, file supplemental requests, or motions to clarify, within ten (10) days of the date of this order should they think any request has been overlooked, incorrectly or inconsistently decided, or if they believe other pertinent factual or legal rulings are appropriate but have not been presented and are not resolved in this order.

Plaintiffs' requests in Counts 3 and 4 of the complaint for declaratory and injunctive relief are denied.  Judgment for defendants on Counts 3 and 4 shall be entered and the case closed.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

September 29, 2006

cc:  Amy B. Messer, Esq.
     Suzanne M. Gorman, Esq.